## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF ILLINOIS

PETER GAKUBA,                    )
                                 )
                    Plaintiff,   )
                                 )
vs.                              )      Case No. 3:20-cv-00277-SMY
                                 )
PENNY GEORGE,                    )
ROB JEFFREYS, and                )
KIMBERLY BIRCH,                  )
                                 )
                    Defendant.   )

## MEMORANDUM AND ORDER

**YANDLE, District Judge:**

This matter is before the Court on Defendants' Motions for Summary Judgment (Docs. 122, 132).  For the following reasons, the motions are **GRANTED**.

## BACKGROUND

Plaintiff Peter Gakuba filed this action pursuant to 42 U.S.C. § 1983, alleging deprivations of his constitutional rights at Vienna Correctional Center from September 4, 2019, through April of 2021.  (Doc. 1).  Following the Court's threshold review (Doc. 18), Plaintiff proceeded on the following claims:

> Count 1:    ADA and RA claim against Rob Jeffreys for ignoring Plaintiff's physical/mental disabilities by denying him permanent medical permits for bottom bunk and relief from job assignments and exertion (bending, twisting and lifting over 20 pounds); refusing to transfer him; ignoring his sick call requests for relief from heat; and hindering his access to legal boxes.

> Count 2:    Eighth Amendment deliberate indifference claim against Dr. Birch and Penny George for deliberate indifference to Plaintiff's physical/mental conditions as described in Count 1

Count 3:        Fourteenth Amendment equal protection claim against Dr. Birch for refusing to transfer Plaintiff to another prison when another similarly situated prisoner was granted a transfer in the Summer of 2018 due to the risks he faced from the heat at Vienna.

Count 4:        Medical negligence and/or medical malpractice claim against Dr. Birch and Penny George for denying that Plaintiff suffered from any physical/mental disabilities and failing to treat his conditions, including requiring him to sleep on a steel slab causing back and neck pain and exposing him to harm from the heat.

Count 5:        Gross negligence/negligence claim against Dr. Birch for failing to grant him a transfer to an air-conditioned prison with a spring bed, destroying his foam bed pad, and placing his legal boxes where he could not lift or move them.

At the close of discovery Defendants filed motions for summary judgment (Docs. 122, 132).  Plaintiff did not respond to either motion.  Therefore, the facts are taken from Defendants' motions and supporting evidence, but are construed in the light most favorable to Gakuba.

## **FACTS**[1]

Plaintiff was admitted to the custody of the Illinois Department of Corrections (IDOC) at the Stateville Reception and Classification Center.  An Offender Medical History form dated July 2, 2015, from Stateville indicated no allergies.   (Doc. 133-4 at 110).   He self-reported autism/Asperger's and frequent heat strokes.  (Doc. 133-4 at 110).

In July 2015, Plaintiff transferred to Robinson Correctional Center and went briefly on a court writ to Dixon Correctional facility where he reported no allergies, but reiterated that he was sensitive to heat.  (Doc. 133-4 at 120).  Plaintiff was seen for heat exhaustion or heat stroke at Dixon on July 17, 2015.  (Doc. 133-4 at 122, 124-125).  Plaintiff returned to Robinson by July 29, 2015.

Plaintiff injured his back while moving a property box at Robinson in August 2016.  (Doc.

---

[1] For ease of comprehension, the Court will provide a basic overview of Plaintiff's incarceration and medical incarceration history and will organize pertinent facts by medical condition.

133-4 at 169).  An x-ray was ordered and performed.  (Doc. 133-4 at 175; Doc. 133-4 at 22).

Plaintiff transferred to East Moline Correctional Center in October 2017.  (Doc. 133-4 at 231, 233).  At East Moline, security staff once brought him to the healthcare unit for examination of his eye, and it was noted that he had "nevus of ota," a bluish pigmentation on and around his right eye.  (Doc. 133-4 at 248).  While being seen for his eye discoloration, Plaintiff also wanted to speak with the doctor about a seafood allergy, which the doctor noted had never been documented before.  (Doc. 133-4 at 249).

Plaintiff was transferred back to Robinson in June 2018.  (Doc. 133-4 at 269).  He reported no allergies upon his return but did request medications and permits for back pain.  (Doc. 133-4 at 273).  On August 30, 2019, Plaintiff made a request for mental health services because he did not believe he should be transferred to another prison based on his medical conditions.  (Doc. 133-4 at 294).

Plaintiff was transferred to Vienna Correctional Center on September 4, 2019 and remained there until his release from IDOC in April 2021.

### Seafood Allergy

Plaintiff did not report his seafood allergy upon admission to IDOC custody.  He testified during his deposition that it began during childhood.  (Doc. 133-4 at 110; Plaintiff's Deposition, Doc. 123-3 at 183:7-17).  He also testified that his seafood exemption was honored at Robinson but challenged at East Moline, even though staff at East Moline helped him to avoid seafood. (Doc. 123-3 at 178: 4-12).

Upon arrival at Vienna, Plaintiff self-reported a seafood allergy.  (Doc. 123-2 at 431).  On November 1, 2019, a nurse practitioner at Vienna recommended a no seafood diet, but it is not clear if it was implemented.  (Doc. 133-4 at 322).

Plaintiff was seen by Dr. Birch for follow-up regarding his alleged seafood allergy on February 7, 2020. (Doc. 123-2 at 451). Dr. Birch noted that there was no documentation of a seafood allergy in his file and informed him that documentation from his doctor would be needed. Dr. Birch offered a blood test to quickly confirm the allergy, but Plaintiff declined in favor of trying to contact his father for proof of his allergy. (Doc. 123-2 at 450-454). Plaintiff raised a concern about weight loss, which Dr. Birch noted was not significant at the time. She offered to run other lab tests to determine if he had thyroid problems or other health issues. (Doc. 123-2 at 451). Plaintiff agreed to the labs, but later refused them. (Doc. 123-2 at 451, 455). Dr. Birch also ordered monthly weight checks to track any appreciable weight loss. (*Id.* at 452).

Dr. Birch followed-up on the refused labs on February 19, 2020. Plaintiff expressed concern that he was being tricked into an allergy test, which she denied. He indicated he still wished to try to contact his parents about his allergy. Dr. Birch scheduled a follow-up in three months to keep track of the situation. (Doc. 123-2 at 456).

In late May 2020, Dr. Birch noted that Plaintiff's weight had dropped from 154 to 133 pounds since February 2020.[2] She saw him regarding his dietary issues and discussed labs to check for other health issues. She indicated she would look into his food allergy issue further by reviewing his commissary purchases and dietary meals. (Doc. 123-2 at 524-527). She ultimately ordered a no seafood diet on June 1, 2020, because Plaintiff did not buy food from commissary and she believed he may nutritionally need a substitute for fish given his weight loss. (Doc. 123-2 at 528-29).

---

[2] Dr. Birch noted Plaintiff had been refusing the monthly weight checks that she ordered in February 2020, but she became aware of his weight loss because he allowed his weight to be recorded for a separate reason in May 2020. (Doc. 123-2 at 524).

Plaintiff was seen on July 29, 2020 for follow-up on his weight because he was refusing weight checks that were previously ordered by Dr. Birch. (Doc. 123-2 at 542-556). He refused to have his weight checked at that time and reiterated his request for a non-seafood diet. (*Id.*). He indicated that at the time of the visit that he had not been receiving any seafood on his trays. (*Id.* at 552). The provider recommended that Plaintiff be placed on observation to record his dietary habits because he was refusing diagnostic testing to assess his nutrition and weight. (*Id.* at 554-556). Plaintiff was placed in observation from July 28, 2020 to July 30, 2020, when he agreed to the diagnostic labs. (Doc. 123-2 at 556-572). His weight was recorded as 155 pounds on July 30, 2020. (*Id.* at 574).

### Nevus of the Ota

On January 26, 2018, Plaintiff was seen by medical staff who documented nevus of the ota ("nevus"). (Doc. 133-4 at 248). Plaintiff reported during a nurse sick call on September 13, 2019 that heat from the outdoors "seems to irritate" his nevus. (Doc. 133-4 at 308). Plaintiff testified that when he irritated his nevus, he would spritz or splash his face with water that was accessible in his cell. (Doc. 123-2, Plaintiff Dep. 163:21-164:2). According to Dr. Birch, a nevus of the ota is a benign skin condition that is not associated with heat sensitivity. (Doc. 133-1, Birch Declaration at ¶ 5n).

### Back pain

On September 13, 2019, Plaintiff reported to a nurse that his low back pain was caused by a fractured back at age 11. (Doc. 133-4 at 309). He saw a nurse practitioner on September 18, 2019, at which time he reported low back pain and requested a low bunk permit/medically unassigned status and a thick mattress. (Doc. 133-4 at 311). The nurse practitioner allowed a

temporary low bunk permit and unassigned status. (*Id.*). She ordered a back x-ray, which Plaintiff declined on September 23, 2019. (*Id.*, 312).

Dr. Birch first saw Plaintiff on October 4, 2019 to follow-up regarding his x-ray refusal and heat related concerns. (Birch Decl., 123-1 at ¶ 5k). He requested a thick mattress with special springs to address his chronic back pain. (*Id.*). Dr. Birch noted that his physical exam a month prior was normal, and that he refused x-rays to assess his back. (*Id.* at ¶ 5l). Prior x-rays from October 2016 revealed mild degenerative disk disease but did not show any other injuries. (*Id.* at ¶ 5l). Despite being unable to confirm a specific injury, Dr. Birch issued low bunk and medically assigned permits for a year. (*Id.* at ¶ 5l).

Plaintiff went to nurse sick call for ongoing back pain on November 19, 2019. He reported the cause of pain was a June 2016 injury and requested a low gallery permit. (Doc. 133-4 at 327). No physical findings or abnormalities were noted. Plaintiff was submitted for a follow-up. (*Id.*).

Plaintiff went to nurse sick call on January 3, 2020 following a reported fall walking downhill. He refused a follow-up doctor's appointment a few days later. (Doc. 123-2 at 436-439). He was seen later the day of the refusal and asked about how to get a low gallery permit. He was told that because he had no injuries other than superficial abrasions, he did not qualify for the permit. (Doc. 123-2 at 440-442).

Plaintiff saw Dr. Birch for his back pain in January 2020. He reported that he slipped and fell on stairs in the rain and needed a low gallery permit. (*Id.* at ¶ 5s). He stated he normally had no problems traversing stairs. Dr. Birch determined that a low gallery permit was not medically necessary. (*Id.* at ¶ 5s).

Plaintiff went to a doctor sick call on February 26, 2020. He complained of neck pain and problems with his bed. He was prescribed Robaxin. (Doc. 123-2 at 462).

Plaintiff saw Dr. Birch about his seafood diet in May 2020.  He also complained that he had neck pain in association with his back pain.  Dr. Birch discussed his refusal to have x-rays to better assess his problems.  (Doc. 123-2 at 526).  Plaintiff then stated that his Robaxin prescription was okay for his pain.  (*Id.*).

Plaintiff's low bunk permit was continued for a year on August 10, 2020, without explanation at a doctor's visit.  (Doc. 123-2 at 584).  Plaintiff re-presented multiple times in August 2020 concerning his back/low bunk, which he said he needed for a 2016 injury.  (Doc. 123-2 at 587-99). On August 31, 2020, the low bunk permit was revoked, and it was noted he did not qualify.  (Doc. 123-2 at 600).

Plaintiff returned to nurse sick call on September 25, 2020 and expressed concerns about a bottom bunk permit which he claimed he needed because he had autism which makes him "stumbly." (Doc. 123-2 at 466).

Plaintiff returned to nurse sick call on October 6, 2020.  He stated he needed a low bunk because of multiple fractures, sciatica, autism, heat strokes, and various other health issues.  (Doc. 123-2 at 469).

Plaintiff followed up about his low bunk concerns with a doctor on October 12, 2020, who explained he did not meet the requirements for a low bunk.  (Doc. 123-2 at 470-71).  Plaintiff reiterated that he needed the bunk permit for clumsiness.  (*Id.*).

**Heat strokes**

Plaintiff suffered a heat stroke or heat exhaustion at Dixon in July 2015.  (Doc. 133-4 at 122-125).  He suffered another heat stroke on September 10, 2019, while attempting to carry a heavy property box up a flight of outdoor stairs.  He was taken to the healthcare unit where he rested and was observed in air conditioning overnight.  (Doc. 133-4 at 299-302).  A nurse

practitioner evaluated him and discharged him to his housing unit. She noted he raised concerns such as permits, a hunger strike, and the need for a transfer to an air-conditioned facility. (*Id.* at 302). Plaintiff reported his heat stroke concerns to a nurse practitioner on September 18, 2019, and indicated he believed he should be transferred to an air-conditioned facility. (Doc. 133-4 at 311).

Plaintiff reiterated his heat stroke concerns during nurse sick call on October 1, 2019. He self-reported multiple additional heat stroke/exhaustion issues in intervening days. At the time of the visit, his vital signs were normal, and a heat stroke was not indicated. (Doc. 133-4 at 314-315; Dr. Birch Decl., Doc. 123-1 at ¶ 5j).

Plaintiff and Dr. Birch discussed his heat related concerns on October 4, 2019, and he expressed his desire to be returned to a facility with air conditioning, which he believed was essential to his health. (Dr. Birch Decl., Doc. 123-1 at ¶ 5k). Dr. Birch concluded that because it was then fall, air-conditioning was not necessary. (*Id.* at ¶ 5k).

Dr. Birch next saw Plaintiff and discussed his heat related concerns on June 25, 2020. (Dr. Birch Decl., Doc. 123-1 at ¶ 5ii). Plaintiff stated he would dismiss her and her subordinates from pending civil lawsuits if she would transfer him to an air-conditioned prison. (*Id.* at ¶ 5ii). Dr. Birch refused to engage Plaintiff's negotiation attempt, but at Plaintiff's request, indicated she would consult the Robinson medical director about his heat stroke issues. (*Id.*). Dr. Birch had no further interactions with Plaintiff about his heat sensitivity.

In August and September 2020, Plaintiff again complained about heat sensitivity and was seen both on nurse sick call and by a doctor. (Doc. 123-2 at 598-99, 604-05, 608-610). At the doctor's visit September 21, 2020, he insisted he should be provided a fan and/or should be

transferred to facility with air conditioning.  (Doc. 123-2 at 608-10).  The doctor noted he had experienced no subsequent episodes of diagnosed heat stroke.  (Doc. 123-2 at 609).

Plaintiff testified at his deposition that he prevented subsequent heat strokes by limiting his movement and activity during the hottest times.  (Doc. 123-2, Plaintiff Dep. 132:14-20, 150:4-18).

### Chronic Allergies

Plaintiff was seen in March 2020 for chronic seasonal allergies.  He reported his prescription for Zyrtec was not working.  (Doc. 123-2 at 514).  Dr. Birch saw him for complaints of chronic allergies and noted his improper usage of Zyrtec (he reported taking 2-3 pills a day).  (Doc. 123-2 at 516).  She recommended that he take Zyrtec as prescribed and added Singulair.  (Doc. 123-1, Dr. Birch Declaration at ¶ 5z).

Plaintiff was seen at nurse sick call on March 18, 2021, concerning his allergies, at which time he reported he was taking three Zyrtec pills at a time and asked for more pills.  (Doc. 123-2).  The nurse educated Plaintiff on proper dosage and asked him to retrieve any medications he had in his cell to establish the quantity he possessed.  (doc. 123-2 at 488-89).  Plaintiff produced six pills and reported discarding others.  (*Id.* at 489).  The nurse had security search his cell, at which time his cellmate reported that Plaintiff sells his medications in his housing unit.  (*Id.* at 489-90).  Plaintiff was informed he could no longer keep the medications in his cell.  (*Id.* at 489-90).

A week later Plaintiff sought healthcare because he believed his allergy medications had not been working for the past few months.  He argued with staff about not being able to keep them in his cell any longer.  (Doc. 123-2 at 496-501).  He threatened to sue staff if they did not return his medications.  (*Id.* at 498-99).

Plaintiff refused a physical examination on March 26, 2021.  Given his complaints about his allergy medications, Claritin was added to his medication.  (Doc. 123-2 at 502).  On April 5, 2021, Plaintiff asked that his Singulair and Claritin be discontinued.  (Doc. 123-2 at 508).

### Asperger's

Defendants submitted mental health records that do not reflect a formal Asperger's diagnosis.  (Doc. 133-5).  In a September 22, 2020 mental health session, Plaintiff suggested that his autism caused him to be clumsy and should provide a reason for his low bunk permit to be renewed.  (Doc. 133-5 at 86).  Plaintiff testified that Asperger's made him prefer continuity over change, and that he wanted to have access to more reading materials to stimulate his intellectual capacity.  (Doc. 123-3, Plaintiff Dep. At 83:18-84:14).  He also testified that he wanted a mental health professional to diagnose him and to provide a treatment plan to make incarceration more tolerable for him.  (*Id.* at 85:11-21).

### DISCUSSION

Summary judgment is proper if there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law.  FED. R. CIV. P. 56(a).  The moving party bears the initial burden of demonstrating the lack of any genuine issue of material fact.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  Once a properly supported motion for summary judgment is made, the adverse party must identify specific facts in the record showing that genuine issues of material fact exist precluding summary judgment.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986).  In deciding a motion for summary judgment, the court "…must view all the evidence in the record in the light most favorable to the non-moving party and resolve all factual disputes in favor of the non-moving party."  *Hansen v. Finantieri Marine Grp., LLC*, 763 F.3d 832, 836 (7th Cir. 2014).

**Dr. Birch – (Doc. 122)**

The Eighth Amendment prohibits deliberate indifference to the serious medical needs of prisoners.  *Machicote v. Roethlisberger*, 969 F.3d 822, 827 (7th Cir. 2020) (citing *Estelle v. Gamble*, 429 U.S. 97, 104 (1976)).  An inmate proceeding on a claim of deliberate indifference to medical needs must offer evidence that he suffered from an objectively serious medical condition, and that the defendant knew of and disregarded a substantial risk of harm.  *Murphy v. Wexford Health Sources Inc.*, 962 F.3d 911, 915 (7th Cir. 2020).

A medical condition is objectively serious if it "has been diagnosed by a physician as mandating treatment" or is "so obvious that even a lay person would perceive the need for a doctor's attention."  *Perry v. Sims*, 990 F.3d 505, 511 (7th Cir. 2021) (quoting *Greeno v. Daley*, 414 F.3d 645, 653 (7th Cir. 2005).  An inmate may establish deliberate indifference to such a condition by demonstrating that the treatment he received was blatantly inappropriate.  *Greeno*, 414 F.3d at 654.  Medical professionals are entitled to deference in treatment decisions unless "no minimally competent professional would have so responded under those circumstances."  *Sain v. Wood*, 512 F.3d 886, 894-95 (7th Cir. 2008).  Disagreement between an inmate and his doctor, or even between two medical professionals, about the proper course of treatment generally is insufficient, by itself, to establish an Eighth Amendment violation.  *Johnson v. Doughty*, 433 F.3d 1001, 1013 (7th Cir. 2006).  Dr. Birch argues she is entitled to summary judgment because Plaintiff's conditions did not present objectively serious medical issues, and even if they did, her course of care did not constitute deliberate indifference.  The Court agrees.

A refusal to participate in confirmatory diagnostic testing can negate a claim for deliberate indifference.  *See, Walker v. Peters*, 233 F.3d 494, 502 (7th Cir. 2000) (affirming summary judgment in favor of doctors who offered confirmatory testing for HIV that an inmate refused to

accept).  At the time of Plaintiff's initial visit with Dr. Birch on October 4, 2019, Plaintiff had refused an x-ray to determine the origin of his back pain.  Nevertheless, Dr. Birch provided Plaintiff accommodations and treatment for these conditions. She reviewed the most recent x-ray films in his prison file from 2016 which showed fairly mild arthritic deterioration.  She gave him low bunk and medically unassigned permits for a year.  She also provided pain medication when he reported he had developed neck pain in relation to his back pain.  Against this backdrop, it cannot be said that Dr. Birch was deliberately indifferent to Plaintiff's chronic back pain.

With respect to Plaintiff's self-reported seafood allergy, Dr. Birch offered a confirmatory blood test, which Plaintiff refused.  When she became concerned about Plaintiff's weight loss in May 2020, Dr. Birch offered other diagnostic labs to assess his overall health and removed seafood from Plaintiff's diet despite her inability to confirm the allergy.  Plaintiff refused to participate in ongoing weight checks and refused routine allergy testing as ordered and refused by Dr. Birch.  He insisted that because previous facilities had simply acted on his self-reported allergy, Dr. Birch should follow along.  But his self-report of an allergy without medical evidence cannot support a finding of deliberate indifference. *See e.g., Steele v. Zwiers*, 2014 WL 631698 (E.D. Wisc. Feb. 18, 2014) (finding that prison doctors were not deliberately indifferent to an inmate's medical needs where the inmate had no confirmed tomato allergy and relied on self-reporting and dietary preferences at past institutions to seek a special diet).

Plaintiff also reported a predisposition to heat stroke/heat exhaustion to Dr. Birch during his initial visit with her on October 4, 2019.  Obviously, at that time, the risk of him suffering with that condition had abated for the year, and no action was required by Dr. Birch.  She next saw Plaintiff for complaints related to heat on June 25, 2020, at which time she indicated she would attempt to verify his concerns with the Robinson medical director at Plaintiff's request.  Whether

she did so before she left her employment at Vienna on July 21, 2020 (Doc. 123-1, Birch Decl., at ¶ 5kk) is both unclear and insignificant because other than the September 2019 incident at Vienna, there is no documentation of Plaintiff suffering a heat stroke during the course of Dr. Birch's treatment.  Moreover, Plaintiff testified that he learned to manage his sensitivity to heat at Vienna by limiting his movement on the hottest days and applying cool cloths.  As such, there is no evidence in the record the heat stroke/exhaustion was a serious medical issue for Plaintiff or that he suffered any harm to support his deliberate indifferent claim.

Plaintiff's claim based on his nevus of the ota fares no better.  While Plaintiff testified during his deposition about how the nevus condition *could* pose a risk to his eye health, this speculation alone does not establish an objectively serious medical issue.  And Dr. Birch indicated via signed declaration that nevus is not negatively impacted by heat.  On this record, no reasonable jury could conclude that Dr. Birch was deliberately indifferent with respect to this condition.

Finally, as a matter of law, Dr. Birch was not deliberately indifferent for her treatment of Plaintiff's seasonal allergies.  The seriousness of seasonal allergies as a medical condition is debatable, but even assuming Plaintiff's allergies are sufficiently serious, as Dr. Birch prescribed additional medication to manage his discomfort, she did not exhibit deliberate indifference in this regard.  She is therefore entitled to summary judgment on **Count 2**.

Dr. Birch is also named in Count 3, for allegedly violating Plaintiff's right to equal protection by denying him transfer to an air-conditioned facility, despite having allowed transfer for another inmate with severe burns on his face. Under the Fourteenth Amendment's Equal Protection Clause, a plaintiff who does not allege that he is a member of a protected class may bring a claim of discrimination under a "class-of-one" theory." *145 Fisk, LLC v. Nicklas*, 986 F.3d 759, 770-71 (7th Cir. 2021).  To sustain such a claim, a plaintiff must provide evidence from which

a reasonable jury could infer he was treated differently from others similarly situated and that there was no rational basis for the difference in treatment. *Id.* at 771. "To be similarly situated, a comparator must be identical or directly comparable to the plaintiff in all material respects." *Miller v. City of Monona*, 784 F.3d 1113, 1120 (7th Cir. 2015).

As Dr. Birch argues, there is not sufficient evidence to suggest that Plaintiff and this other inmate are similarly situated for purposes of a class-of-one equal protection claim. Plaintiff suggested in his pleadings and his deposition that the inmate who was transferred had sustained severe disfigurement and burns on his face, which were exacerbated by heat. Plaintiff's condition, for which he argued he should be transferred, was nevus, which Dr. Birch averred in her declaration was benign and not exacerbated by heat. Thus, even crediting Plaintiff's testimony that he suffered some discomfort related to nevus, he has failed to produce evidence on the record sufficient to established that his birthmark like condition is similar in "all material" respects, such that the other inmate was a fair comparator. Therefore, Dr. Birch is entitled to summary judgment on **Count 3**.

This leaves the state law negligence claims against Dr. Birch in Counts 4 and 5. To minimize frivolous medical malpractice lawsuits, Illinois law requires the plaintiff to file a physician's certificate of merit and accompanying report with every malpractice complaint. *See Sherrod v. Lingle*, 223 F.3d 605, 613 (7th Cir. 2000) (citing 735 Ill. Comp. Stat. 5/2-622). Here, Plaintiff has not submitted a verifying medical affidavit (which is required at summary judgment) for Count 4, in which he asserts a medical negligence claim against Dr. Birch for failing to address his back and neck pain and heat sensitivity. Consequently, **Count 4** is subject to dismissal.

Count 5 alleges simple negligence against Dr. Birch for refusing a transfer to an air-conditioned prison and does not require the same certification. Nevertheless, because all federal

claims against Dr. Birch will be dismissed, the Court declines to exercise supplemental jurisdiction over this claim; **Count 5** will be dismissed as well.  *See* 28 U.S.C. § 1367(c)(3).

### Penny George (Doc. 132)

Plaintiff's only allegation against Defendant George is that she, as healthcare administrator, knowingly ignored his nurse sick call slips at least nine times from September to October of 2019 when he was suffering from heat stroke/exhaustion.  In support of this allegation, Plaintiff supplied purported copies of sick call slips dated September 13, 2019 through September 17, 2019 (daily) and from September 26, 2019 through September 29, 2019 (again daily).  (Doc. 1 at 32-36).  He notes in writing on these exhibits that he sought medical care nine times but was seen by nurse sick call zero times.  (Doc. 1 at 36).  However, Plaintiff's assertion is plainly contradicted by the medical records submitted by Defendants.

The medical records contain nurses notes from September 13, 2019 (Doc. 123-2 at 282), September 19, 2019 (Doc. 123-2 at 288), September 23, 2019 (indicating that Plaintiff refused x-rays on September 23, 2019) (Doc. 1 at 287), and October 1, 2019 (Doc. 123-2 at 290-91).  The notes reflect the medical staff's attempts to assess and be responsive to Plaintiff's stated needs.  Additionally, a temporary medical permit for low bunk and medically unassigned status issued on September 18, 2019 and extended for a year on October 4, 2019 (Doc. 1 at 30, 31).

Significantly, George was not a licensed physician and was not able to diagnose conditions or prescribe a particular course of treatment.  (Doc. 154, George Decl. at ¶ 3).  Faced with this evidence, no reasonable jury could find that George was deliberately indifferent to Plaintiff's medical needs in September or October 2019.[3]  Summary judgment will be granted in George's favor on **Count 2**.

---

[3] Penny George left her employment at Vienna in June of 2020.  To the extent Plaintiff had medical issues beyond that date, George was not involved.  (Doc. 154, George Decl. at ¶ 1).

George also seeks summary judgment on the gross negligence/negligence claim asserted against her in Count 5.  She argues this claim must be dismissed because Plaintiff did not submit the medical certification required by Illinois law, but as previously noted, a general or simple negligence claim does not require certification.  That said, because the only federal claim against George will be dismissed, the Court declines to exercise supplemental jurisdiction the state law negligence claim asserted against her in **Count 5**; it will be dismissed as well. *See* 28 U.S.C. § 1367(c)(3).

### Rob Jeffreys (Doc. 132)

In Count 1, Plaintiff brings an ADA/Rehabilitation Act claim against Defendant Rob Jeffreys in his official capacity as the former IDOC Director.  Jeffreys argues that Plaintiff's medical conditions did not qualify him as disabled for purposes of the ADA, that the accommodations he sought were not reasonable, and that he did not establish deliberate indifference for purposes of compensatory damages.

"Discrimination claims under the ADA and Rehabilitation Act are governed by the same standards, with one exception related to causation[.]"  *Bowers v. Dart*, 1 F.4th 513, 519 (7th Cir. 2021).  Under both statutes, a plaintiff must prove he is a qualified individual with a disability, and that he was denied access to a service, program, or activity because of his disability.  *Id.*, citing *Shuhaiber v. Ill. Dep't of Corr.*, 980 F.3d 1167, 1170 (7th Cir. 2020).  The ADA defines a disability as either "a physical or mental impairment that substantially limits one or more major life activities"; "a record of such an impairment"; or "being regarded as having such an impairment." 42 U.S.C. § 12102(1); *see also* 29 U.S.C. § 705(9)(b) (Rehabilitation Act's definition of disability refers to the ADA).  Major life activities include walking, standing, bending, and caring for oneself. *Jaros*, 684 F.3d at 672.  An "impairment need not prevent, or significantly or severely restrict, the

individual from performing a major life activity in order to be considered substantially limiting." *Id.; see also Hirmiz v. New Harrison Hotel Corp.*, 865 F.3d. 475, 476 (7th Cir. 2017).  Factors relevant to a court's determination include "the nature and severity of the impairment, the duration or expected duration of the impairment, and the permanent or long-term impact of the impairment." *Smith v. Concentra, Inc.*, 240 F. Supp. 3d 778, 786 (N.D. Ill. 2017).

An individual is "regarded as" having a qualifying impairment if subjected to a prohibited action "because of an actual or perceived physical or mental impairment whether or not the impairment limits or is perceived to limit a major life activity."  42 U.S.C. § 12102(1)(C), 3(A). "To meet the 'regarded as' prong, the [defendant] must believe, correctly or not, that the [plaintiff] has an impairment that substantially limits one or more of the major life activities."  *Bowers*, 1 F.4th at 520, citing *Povey v. City of Jeffersonville*, 697 F.3d 619, 622 (7th Cir. 2012).

Under the ADA or the RA, a reasonable accommodation does not require a perfect cure for the problem.  *See Stewart v. County of Brown*, 86 F.3d 107, 112 (7th Cir. 1996); *see also Wagoner*, 778 F.3d at 593.  In defining a reasonable accommodation in in the correctional facility context, courts consider the accommodation "in light of the overall institutional requirements," including security and safety concerns and "administrative exigencies." *Love*, 103 F.3d at 561. This determination is "highly fact-specific" and requires a case-by-case analysis. *Dadian v. Village of Wilmette*, 269 F.3d 831, 838 (7th Cir. 2001).

To recover damages under the ADA, a plaintiff must identify intentional conduct (not mere negligence) by a named defendant.  *See Barnes v. Gorman*, 536 U.S. 181, 187–89, 122 S.Ct. 2097, 153 L.Ed.2d 230 (2002) (analyzing § 202 of the ADA and § 504 of the Rehabilitation Act).  This

requires the plaintiff to plausibly allege that the defendant acted with deliberate indifference to rights conferred by the Act.  *See Lacy v. Cook County*, 897 F.3d 847, 862–63 (7th Cir. 2018).[4]

Defendants argue that Plaintiff's heat sensitivity and his self-reported Autism/Asperger's do not render him a qualified individual under the ADA/RA because they do not cause major impairments of his life activities, and that nevus of ota is not a disability at all.  They also contend that while his back pain and seafood allergies could be considered qualifying disabilities, they were neither adequately documented in medical records or otherwise supported by the case record, nor was he regarded as having these impairments.  Finally, Defendants argue that even if any of these conditions are sufficient to warrant some accommodation, the accommodations Plaintiff requested were not reasonable, and that he has not established deliberate indifference to warrant compensatory damages.

The evidence in the record would not support a finding that Plaintiff's susceptibility to heat stroke/exhaustion limits a major life activity, given "the nature and severity of the impairment, the duration or expected duration of the impairment, and the permanent or long-term impact of the impairment."  *Shaw v. Williams*, 2018 WL 3740665 *8 (N.D. Ill Aug. 7, 2018), citing *Smith v. Concentra, Inc.*, 240 F.Supp.3d 778, 786 (N.D. Ill. 2017).  Taking Plaintiff's deposition testimony at face value, although he described unpleasantries associated with heat sensitivity, such as need to remain still on the hottest days, or to perform activities slowly, he did not describe an inability to carry on with the basic tasks of life such as eating, sleeping, working on his legal cases, etc.

Likewise, Plaintiff fails to satisfy the second and third prongs for establishing an ADA claim – that the condition either be recorded, or that he be regarded has having this disability.  The

---

[4]By contrast, Plaintiff cannot recover monetary damages under the Rehabilitation Act.  Because Plaintiff has been released from custody, this aspect of his claim in Count 1 is **MOOT**.  *See e.g., Lane v. Pena*, 518 U.S. 187, 192-97 (1976) (the Rehabilitation Act only allows claims for injunctive relief).

medical records contain many notes reflecting Plaintiff's self-reported heat sensitivity, but no actual diagnosis. During his deposition, he stated he was never specifically diagnosed with a heat sensitivity condition and that he avoided problems with his sensitivities throughout his life by minimizing his exposure to heat. Nor does the evidence in the record establish that the prison regarded him as a having a predisposition to heat strokes or heat exhaustion. Thus, the Court finds as a matter of law that Plaintiff's heat sensitivity did not qualify as a disability for purposes of the ADA, and the prison did not need to provide accommodations for that condition.

Plaintiff also alleged that his nevus of the ota was impacted by heat. Nevus was documented in Plaintiff's medical records in a few instances, including one occasion when he told a nurse that it 'burned' a bit. Despite this one report, there is no evidence in the record that nevus impacted his ability to function for any significant period. And, brief periods of impairment do not support a finding that Plaintiff suffered a disability within the meaning of the ADA. *See, Shaw*, 2018 WL 3740665 at *9 (N.D. Ill. Aug. 7, 2018). In sum, the evidence on record is also insufficient to establish that Plaintiff's nevus constituted a disability under the ADA.

Plaintiff has also failed to establish that he qualifies under the ADA for accommodation based on his seafood allergy; there is no medical record of the allergy while Plaintiff was at Vienna, and he was not regarded as allergic to seafood. In fact, there are many places in the record where providers explicitly noted the lack of a record or proof that Plaintiff has a seafood allergy. And although some previous facilities omitted seafood from his diet, this appears to have been done only at his request and not because he had a diagnosed allergy. At Vienna, Plaintiff repeatedly refused testing to confirm it.

Eventually, when she discovered that Plaintiff had a significant weight loss, Dr. Birch allowed a no-seafood diet because Plaintiff's refusal of diagnostic testing left her with essentially

no options to address the weight loss.  Even if the allergy were considered a qualifying disability, and a no-seafood diet was a reasonable accommodation.

Similarly, Plaintiff has not established that IDOC was deliberately indifferent for their handling of his seafood complaints.  Vienna offered testing to pinpoint his allergy and eventually offered an alternative diet when Plaintiff's refusal to cooperate left no other avenue to address his weight loss.  Against this backdrop, it cannot be said the facility was deliberately indifferent in this respect.

Finally, the evidence regarding Plaintiff's chronic back pain would not support a finding in his favor on his ADA claim.   There is evidence that Plaintiff suffered an acute back injury in 2016, which may have been the source of chronic back pain and discomfort.  As a result, prisons in which Plaintiff was incarcerated prior to 2019 gave him permits for a low bunk and medically unassigned status (no prison job), and he alleges they also gave him special mattress accommodations.

The low bunk/unassigned permits were continued at Vienna.  To specifically diagnose his back complaints, the medical team attempted to schedule him for an additional x-ray, but he refused to undergo the testing.   Thus, there was no clear diagnosis of a permanent injury. Nevertheless, the evidence may support a finding that IDOC regarded Plaintiff as disabled because they issued the low bunk/unassigned permits, but this is not the end of the inquiry.

To succeed on his failure to accommodate claim, Plaintiff must also establish that he was denied the benefits of services, programs or activities by reason of his disability.  *Wagoner v. Lemmon*, 778 F.3d 586, 592 (7th Cir. 2015).  And he would also have to show that the sought after accommodations were reasonable.  *Love*, 103 F.3d 558, 560 (7th Cir. 1996).  The evidence does not support him on either of these inquiries.

Plaintiff has not demonstrated that he was denied services, programs, or activities by reason of his chronic back pain. He does not identify anything specific that he was unable to do because of his chronic back pain. He complains that it was inconvenient for him to access his personal legal files in one warehouse building and to access the law library in a separate building, but he does not claim he was unable to do it – Inconvenience is not enough to support a failure to accommodate claim. *See e.g., Wagoner,* 778 F.3d at 593.

Additionally, Plaintiff has not shown that the accommodations he received were insufficient and that it would also have been reasonable to give him the accommodation he wanted (a special mattress). He testified he was told the mattress he transferred to Vienna with was not approved due to security concerns; it was viewed as a fire hazard. Despite the mattress not being immediately available, the medical staff offered to further assess his back issues, but he refused to participate in diagnostic x-rays. On this evidence the jury could not reasonably conclude that the additional accommodation was necessary or reasonable. Moreover, even if Plaintiff met the requirements to demonstrate he had a qualifying disability and that he should have received further reasonable accommodations, the only damages he could receive now that he has been released from prison are monetary. But that would require him to also prove that IDOC's handling of his disability issue amounted to deliberate indifference, which for the reasons previously noted, he could not do.

Plaintiff's ADA claim concerning his self-reported Asperger's fails as a matter of law as well. There is no verified record that Plaintiff has Asperger's, and it does not appear that the prison regarded him as such. He has not identified any programs or services from which he was excluded based on this alleged disability. Nor has he identified specific accommodations to which he believes he was entitled. Summary Judgment will be granted on **Count 1** as well.

## CONCLUSION

For the foregoing reasons, Defendant Dr. Birch and Defendants George and Jeffreys' Motions for Summary Judgment (Docs. 122, 132) are **GRANTED** in their entirety.  The Clerk of Court is **DIRECTED** to enter judgment consistent with this Order and to close this case.

**IT IS SO ORDERED.**

**DATED:  September 29, 2023**

*s/ Staci M. Yandle*
**STACI M. YANDLE**
**United States District Judge**

If Plaintiff wishes to appeal this Order, he must file a notice of appeal with this Court within thirty days of the entry of judgment.  FED. R. APP. P. 4(a)(1)(A).  If Plaintiff chooses to appeal, he will be liable for the $505.00 filing fee irrespective of the outcome of the appeal.  *See* FED. R. APP. P. 3(e); 28 U.S.C. § 1915(e)(2); Ammons v. Gerlinger, 547 F.3d 724, 725-56 (7th Cir. 2008).  Moreover, if the appeal is found to be without merit or frivolous, Plaintiff may incur another "strike" under 28 U.S.C. § 1915(g).

A proper and timely motion filed pursuant to Federal Rule of Civil Procedure 59(e) may toll the 30-day appeal deadline.  FED. R. APP. P. 4(a)(4).  A Rule 59(e) motion must be filed no later than 28 days after the entry of judgment, and this 28-day deadline cannot be extended.